**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **HENRY ERIC ROUTON,** | ) | **CASE NO. 7:18CV00112** |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **TERRY DAMERON, ET AL.,** | ) | **By: Glen E. Conrad** |
| | ) | **Senior United States District Judge** |
| **Defendants.** | ) | |

Henry Eric Routon, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that multiple law enforcement and court officials conspired to violate his constitutional rights under the Fourth Amendment. The court previously dismissed many claims, including Routon's conspiracy allegations. Remaining in the case are Routon's claims against two deputies, alleging unlawful search and seizure and use of excessive force, in violation of the Fourth Amendment. Currently before the court is a motion for summary judgment filed by the remaining defendants, Lieutenant Terry Dameron and Investigator Ashley Norton of the Franklin County Sheriff's Office ("FCSO"), and Routon's response thereto. After careful review of the record, the court concludes that the defendants' motion must be granted in part and denied in part.

## I. BACKGROUND.

### A. Routon's Evidence.

In January of 2018, Routon was staying in Room 106 of the Hometown Inn in Franklin County, Virginia, with a guest, Brittany Nichols.[1] On the evening of January 18, 2018, Dennis

[1] This summary of Routon's account is taken from his deposition, Routon Dep., ECF No. 248-4, and his first and second amended complaints, ECF Nos. 47-1 and 248-1. While the court denied Routon leave to file the second amended complaint so as to add or reinstate claims against additional defendants, the court did agree to consider the verified document and its attachments as Routon's response to the defendants' summary judgment motion.

Underwood came to the room and offered Routon some drugs if he would throw away some paraphernalia in a black trash bag. Routon agreed, received and later used $50 worth of methamphetamine, and put Underwood's trash bag in the waste can of the hotel room. Routon asserts that he later pleaded guilty to a charge of possession of methamphetamine, based on this incident that occurred on January 18, 2018. See Routon Dep. 51-52, ECF No. 248-4.

1. Encounter with Dameron and Norton.

On January 19, 2018, about 4:20 p.m., Dameron and Norton knocked on the door. Routon opened the door and learned that they wanted to speak to Nichols, who was asleep at the time. She went outside to talk to Norton, and Routon agreed to step outside to talk to Dameron. Routon and Dameron walked a ways from the door down the hotel balcony. After a brief conversation, Dameron said that he was going to search Routon's room. Routon "denied consent" for a room search. Second Am. Compl. ¶ 23, ECF No. 248-1. Dameron said he would bring a drug sniffing dog and conduct a search if the dog alerted to the room. Routon "then demanded to be permitted past Dameron back into the room [to] retriev[e his] cell-phone and [he] stated that [he] was going to call [his] attorney." Id. at ¶ 25. "Dameron physically restrained [Routon] from reentering [his] room by pushing [him] backwards with his hands and forearm." Id.

Routon patted his pants pockets to signal the absence of his cell phone and again stated that he was going to get his phone from the room to call his attorney. Dameron told Routon he "was not going to call 'No damn lawyer,'" and reached into Routon's pockets, finding only a few coins. Id. at ¶ 27.

Dameron stated that he would have Norton obtain a search warrant for the room. Routon told Dameron to go ahead and repeated his intention to retrieve his cell phone to call his attorney. Dameron said he "smelled 'pot'" on Routon and for that reason, Routon could not go back in the

hotel room. Id. at ¶ 29. Routon argued that he had not been smoking pot and had no pot on his person or in the room.

Routon walked back to the hotel room door. As he stepped inside, Dameron "entered the room behind [him] and tackled [him] to the floor," face first. Id. at ¶ 30. Dameron had Routon's "right leg scissored between both of his legs," and he "was punching [Routon] in [his] right side, face and head repeatedly." Id. Norton then entered the room, "grabbed [Routon's] left arm and hand and began to drop her knee with all of her body weight into [his] left side kidney area causing excruciating pain." Id. at ¶ 31. Routon states that during this struggle, the officers had his "hands and arms in their possession and control" and he "was not resisting." Id. Because of the way the officers were restraining him, Routon felt "pressure on [his] lungs causing [his] breathing to be labored." Id. at ¶ 33.

Norton finally stopped her efforts, and Dameron took Routon's hands and handcuffed them behind his back. As Routon got to his knees, from behind him, Dameron "began to choke him with a lethal carotid choke hold cutting of[f Routon's] blood flow and obstructing [his] wind to the point of near unconsciousness." Id. at ¶ 34. When a female voice yelled for Dameron "to stop choking [Routon] because [he] could not breathe," he stopped. Id. He and Routon stood up, and Dameron announced that Routon "was under arrest for resisting arrest." Id. at ¶ 35.

2. The Room Searches.

After Routon's arrest, Dameron placed him in his patrol car, and Norton left to get a search warrant. Dameron then reentered the hotel room without Routon's consent. Routon contends that while there, Dameron "rummaged through a black trash bag, that he first untied and discovered what he assumed was a 'one-pot' meth lab and he removed it from the trash bag and placed it in the room's waste basket in open view." Id. at ¶ 40.

Routon also asserts that Norton "falsely documented in the affidavit for search warrant that she smelled the odor of marijuana." Id. at ¶ 43. She also stated that she had received "drug intelligence" from an unnamed source about Nichols being pregnant and possibly making methamphetamine ("meth"), both assertions that Routon claims were untrue. Id. Norton also stated in the affidavit that Routon had "hit Dameron" with the hotel room door, which Routon denies. Id. The magistrate issued a search warrant for the room, based on Norton's information. Norton also notified the Virginia State Police about the one pot meth lab Dameron had found, although she did not include that information in the search warrant affidavit. When Norton returned with the search warrant, deputies searched the hotel room.

3. Aftermath.

Based on the January 19, 2018, encounter with Routon, searches of his hotel room, and other evidence, Franklin County authorities charged him with assault on law enforcement, possession of a Schedule II drug, manufacture of methamphetamine, possession of paraphernalia, and obstruction of justice. Ultimately, Routon reached a plea agreement whereby he pleaded guilty to possession of meth, and the other charges were dismissed.

Routon alleges that from this encounter, he "suffered extensive and intermittent pain in his head, throat, neck, torso, shoulder, knees and legs," and still suffers pain sometimes in his shoulders, knees, and legs. Id. at ¶ 36. He has been diagnosed with "Post Traumatic Stress Disorder (PTSD)," takes medication for this disorder, and receives mental health therapy. Id. at ¶ 37.

B. The Defendants' Evidence.

In support of the defendants' motion for summary judgment, they present several affidavits, recordings, and other documentation. See gen. Defs.' Mem. Supp. Mot. Summ. J., ECF

No. 235.[2] The version of events at the Hometown Inn on January 19, 2018, as presented in their evidence, differs from Routon's version.

1. Encounter at the Hotel Room.

Norton had received information that Nichols, who was pregnant, was staying in Room 106 of the Hometown Inn, where she was manufacturing and using methamphetamine. Norton and Dameron went to the room on January 19, 2018, to execute a "knock and talk" with Nichols. Norton Decl. at ¶¶ 2-3. Routon answered the door. Dameron recognized him from prior investigations of past crimes, including violent crimes. Norton asked for Nichols, Routon called her, and she agreed to speak with Norton. Dameron asked Routon to speak with him outside the room, and Routon agreed. Dameron detected the odor of marijuana on Routon's person and asked for Routon's consent to search the room. Routon denied using marijuana and refused to consent to a search. Dameron told Routon that based on the odor of marijuana, he would have Norton obtain a search warrant and that "Routon and Nichols needed to stay outside the room" until Norton returned with the warrant. Dameron Decl. at ¶ 6-7.

At first, Routon stayed outside with Dameron. Then he became fidgety, repeatedly asking to reenter his room and pacing. Dameron told him multiple times that he could not go inside the room until Norton returned with the search warrant and the officers executed it. Because of the Inn's location, Routon's odd behavior, and Dameron's experience that "weapons often accompany drugs," Dameron "frisked Routon by patting down the outside of his clothing for his safety and officer safety." Id. at ¶ 9. He did not find any weapons.

[2] The court will refer to the defendants' exhibits by number, or declaration or deposition abbreviation, as follows: Ex. 1, Dameron Decl. and Attach., including compact disk ("CD") of dash cam video recording; Ex. 2, Norton Decl.; Ex. 3, Routon Dep.; Ex. 4, Dameron Dep.; Ex. 5, search warrant; Ex. 6, Norton Dep.; Ex. 7, Blair Decl.; Ex. 8, certificate of analysis; Ex. 9, Dudley Decl. and Ex. A—indictments, Ex. B—plea agreement, and Ex. C—sentencing order; Ex. 10, Pigg Decl. and Attach.—Franklin County Sheriff's Office intake records and photographs; Ex. 11, Records Custodian Decl. and Attach.—Western Virginia Regional Jail intake records; and Ex. 12, CD of jail telephone call recording.

Several minutes later, Routon "ran to the door of Room 106, entered the room, and attempted to slam the door behind him." Id. at ¶ 10. The door struck Dameron on the arm and shoulder as he chased Routon into the room, followed by Norton. The deputies noticed many objects in the room that could be used as weapons. Dameron grabbed Routon to prevent him from moving further into the room. Routon resisted and tried to pull away. Dameron took Routon to the floor. The deputies yelled for him to stop resisting, but Routon refused and "tucked his hands under himself near his chest." Norton Decl. at ¶ 9. Dameron yelled several times for Routon to stop resisting and offer up his hands, because he was under arrest. Routon continued to struggle and kept his hands under his body. Dameron "administered hand strikes to Routon's side while trying to subdue [him] and get him to give up his hands. Norton administered knee strikes to his side. Routon continued to resist and defy [the officers'] commands to give [them] his hands." Id. at ¶ 12; Norton Decl. at ¶ 10.

Once Dameron was able to get Routon's hands and handcuff them, the deputies stopped all use of force. Dameron denies that he choked Routon as alleged. He and Norton "assisted Routon in standing up from the floor by placing [their] arms in between his arms (which were behind his back) and his rib cage." Dameron Decl. at ¶ 16. As they did so, the deputies noticed several used syringes on the bed. Dameron escorted Routon outside and placed him in his patrol car. Dameron then returned to the room to talk with Nichols, while Norton left to obtain a search warrant.

2. Dameron's Interviews of Nichols and Routon.

Nichols expressed her desire to speak with Dameron where Routon could not hear her and consented to the deputy entering the hotel room. After Dameron read Nichols her Miranda rights, he asked her about the items in plain view around them in the room. She said she and Routon had

used meth and heroin together in the past several days. She said they had used the syringes on the bed to inject the drugs and pointed out a blue pipe on the bed that belonged to Routon. She reported that she and Routon had used the pipe to smoke meth. Nichols said that Routon made meth and that a "bottle" in the waste can could be used for that purpose. Id. at ¶ 18. Dameron "observed a 'one pot' in the trash bag next to the door."[3] Id.

After speaking with Nichols, Dameron asked her to leave the room and returned to his patrol car. He read Routon his Miranda rights, and Routon agreed to speak to him. The entire interview was recorded by the vehicle's dashboard video camera.[4] Dameron states that at no time on January 19, 2018, did Routon ask to call or talk to an attorney, and the dash cam video does not reflect any such request. Routon immediately said that he "wasn't smoking pot." (16:34:59). When Lt. Dameron asked, "then who was?" Routon told him to ask the people in Room 104 (16:35:04) and that people had been coming in and out of Room 106. (16:35:13). Then, Routon denied that anyone had been smoking pot and said there was no marijuana in the room. (16:40:15-20). Routon said he had been gone a lot and did not know who all had been in the room while he was not there. (16:39:08; 16:40:20; 16:38:42; 16:40:50). He accused people in Room 104 of selling drugs (18:43:18) and said he could smell weed coming from them "all the time." (18:44:05).

Routon told Dameron that in the past, officers had come into his house "without a reason." (16:39:49). Dameron replied, "I've never done that," and Routon agreed, "No, no, not you . . . we cool, you've been alright with me. You've never lied." (16:40:00). He said that his arrest was a

[3] The photographs included in the defendants' exhibits indicate that a "one pot" meth lab is a large tea or soda bottle that has been used to heat and combine certain ingredients to create methamphetamine. See, e.g., Norton Decl. Attach. 22.

[4] The dash cam video is attached to Defendants' Exhibit 1, Dameron's declaration. Hereafter, references to portions of the video are cited by approximate timestamp, in parentheses.

"blessing," because he needed to clean himself up (18:40:26), and he called Dameron "a good guy." (18:53:04).

Routon admitted to Dameron that he was a drug user and that he knew meth was being made in his hotel room "today." (16:35:40; 17:04-13). He said he had smoked meth using the pipe on the bed. (16:37:20). He also consented to the deputies' search of the hotel room. (17:00:58). When Dameron asked about the one pot, Routon said that he had not helped to shake the bottle, but had used meth from it and then threw it in the waste can. (17:07:20-42).

Routon apologized to Dameron for his behavior and "sw[ore] to God on [his] children's life" that he ran inside the hotel room because he had to "take a shit." (18:14:04). He admitted that by doing so, he had disobeyed the deputies' commands for him to say outside. Routon Tr. at 71-72. He blamed the door shutting on Dameron's shoulder on a towel under the door that would not allow the door to open all the way, but he also said that he did not remember "exactly how it happened." (19:26:36-19:27:02; 19:28:22-31). Routon insisted that he "did not intend for any assault to happen . . . he did not do it intentionally." (19:27:15).

3. The Search Warrant.

At the Franklin County Sheriff's Office, Norton executed an affidavit for a search warrant and faxed it to J. Allan Blair, the Pittsylvania County magistrate.[5] As material facts constituting probable cause for the search to be authorized, she stated:

> On January 19, 2018, Norton along with Lt. Dameron went to Hometown Inn room 106 reference a drug complaint. Knocked on door and ERIC ROUTON answered, also in the room was BRITTANY NOCHOLS. Asked if it was okay if we spo[k]e to both individuals they both agreed. Inv. Norton and Lt. Dameron both smell[ed] an odor o[f] marijuana coming from room 106. ROUTON denied consent for search. ROUTON and NICHOLS were then detained upon Inv. Norton getting search warrant. ROUTON then immediately tried to enter the room and hit Lt.

[5] Magistrate Blair explains that because Franklin County does not have an assigned magistrate, he frequently handles probable cause hearings for law enforcement officers in that county via live video conferencing. See Defs.' Mot. Ex. 7, Blair Decl., ECF No. 235-7.

> Dameron with the door. ROUTON resisted being placed in cuffs. While trying to detain ROUTON in room 106 used uncapped needles were observed on the bed.

Defs.' Ex. 5. Norton then participated in a live video probable cause hearing with Magistrate Blair. The information Norton provided in the affidavit and stated to the magistrate verbally, while under oath, was based on her personal knowledge of what had happened with Routon at the Hometown Inn. The magistrate determined that the facts Norton stated supported probable cause to search Room 106 and issued a search warrant.[6]

Norton then returned to the Inn to execute the warrant. The rescue squad and the Virginia State Police ("VSP") also arrived. Norton searched Room 106 and documented its contents, while the VSP cleaned up the three, one pot meth labs they found there. Also collected from the room were the blue meth pipe, eight used needles, digital scales, blister packs, and a cold pack. Norton documented all of this evidence on a Search Inventory and Return. She also took photographs of the room and its contents. The residue inside the pipe tested positive for methamphetamine, using a field test kit. Norton placed the evidence in temporary storage at the FCSO. Further testing by the Virginia Department of Forensic Science verified that samples from one of the meth labs and from the pipe were positive for methamphetamine.

4. Routon's Lack of Medical Complaints.

Dameron states that Routon never complained to him about having suffered any injuries from the force Dameron and Norton used to place him under arrest. Dameron also states that Routon had no visible cuts, bruises, or markings from that struggle, and that he never asked

---

[6] Routon has attached copies of the search warrant documents to his first amended complaint. Am. Compl. Ex. H-2, H-3, H-4, H-5, H-7, H-8, I-1, and I-2, ECF No. 47-4. He claims that Norton forged Blair's signature on the affidavit and the search warrant, based on the fact that two different signatures appear on various copies of the documents. Blair states that all these documents are all "true, accurate, and authentic documents"; most of them bear his original signature, while one bears his electronic signature. See Blair Decl. at ¶¶ 8-10.

Dameron for medical attention, even after the rescue squad reported to the scene. Nor did Routon say anything on January 19, 2018, about Dameron choking him, as he now alleges. The only injury Routon complained of that day was that his knees hurt "because [he] has rods in both [his] legs." (15:44:05). The audio on the dash camera video verifies Dameron's account of his conversation with Routon.

The defendants also present a declaration by Sergeant Greg Pigg, who prepared intake documents about Routon when he arrived at the FCSO on January 19, 2018. The records state, and Pigg confirms from his personal observations during intake, that Routon "did not have any markings, bruising, or any other signs of injury." Pigg Decl. ¶ 3. Pigg asked Routon if "he had any pain or injuries, and Routon reported that he had none. Routon did not request any medical services and did not appear to need any medical treatment." Id.

Three days later, on January 22, 2018, Routon was transferred to the Western Virginia Regional Jail ("WVARJ"). At his intake screening, Routon reported he did not have any pain. Defs.' Ex. 11. The only markings on Routon's skin that the intake nurse noted, other than tattoos, were "some bruising on lower legs." Id. In a telephone call with Nichols on January 23, 2018, Routon reported that he had been choked by another inmate. Defs.' Ex. 12.

5. Criminal Charges.

On January 19, 2018, Dameron obtained arrest warrants for Routon and served them on him at the jail. Routon was charged with assaulting a law enforcement officer, possession of a schedule II drug, manufacture of methamphetamine, possession of drug paraphernalia, and obstruction of justice. Dameron Decl. ¶ 28. On August 6, 2018, a grand jury issued indictments charging Routon with possession of twenty grams or more of methamphetamine, obstruction of a

law enforcement officer, possession of controlled paraphernalia, unlawful manufacture of methamphetamine, and assault on a law enforcement officer. Dudley Decl. Attach.

Routon and the Commonwealth entered into a plea agreement on January 28, 2019. Routon agreed to pled guilty to the indictment for felony possession of methamphetamine, amended to remove the drug weight, and to accept an active sentence of three years' incarceration; in exchange, the Commonwealth agreed to "nol prose" the remaining charges against him. Dudley Decl., Attach. Plea Agr. Evidence the deputies discovered and seized during the searches of Room 106 and Dameron's interview of Routon were "integral" in securing the charge to which Routon pled guilty. Dudley Decl. at ¶¶ 5-6. This evidence was also presented as part of the factual basis for Routon's guilty plea and plea agreement. Id. The Franklin County Circuit Court accepted the amendment to the indictment, the plea agreement, and the plea, and sentenced Routon, pursuant to the agreement, to ten years in prison with seven years suspended. Id. at ¶¶ 7-8. The plea agreement and the sentencing order for the charge of possession of methamphetamine to which Routon pleaded guilty indicate the offense date as January 19, 2018.

### C. The Claims.

Routon's amended complaint presents several Fourth Amendment claims, based on the events of January 19, 2018. Liberally construing his submissions, the court recognizes the following asserted claims: (1) Dameron and Norton unreasonably conducted a knock and talk on Routon's hotel room; (2) Dameron unreasonably seized Routon by physically blocking him from returning to his hotel room; (3) Dameron unreasonably searched Routon's pants pockets; (4) Dameron and Norton used excessive force against Routon after he reentered his hotel room; (5) Dameron and Norton committed the state law torts of assault and battery against him in the hotel room; (6) Dameron and Norton unreasonably seized and then arrested Routon for reentering his

hotel room; (7) Dameron unreasonably searched Routon's hotel room without his consent; and (8) Norton used false statements and/or forgery to obtain a search warrant, making her search of the hotel room unreasonable.

## II. Discussion.

### A. The Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In short, a motion for summary judgment should be granted when the proof, taken in the form admissible at trial, could lead a reasonable juror to but one conclusion. Id. at 247-52. On summary judgment, the court must view the record as a whole and draw all reasonable inferences from the facts in the light most favorable to Routon, as the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).[7] In so doing, the court "may not make credibility determinations." Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

To survive summary judgment, Routon must present sufficient evidence that could carry the burden of proof on each element of his claims at trial. Id. "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[7] The court has omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). To hold an official liable under § 1983, the plaintiff must state facts affirmatively showing that the officer acted personally to deprive the plaintiff of, or violate his, constitutional rights. Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

B. The Search and Seizure Claims.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Key components of these protections are further defined in court decisions.

1. The Knock and Talk.

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person" within the meaning of the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 16 (1968). On the other hand, law enforcement officers do not violate constitutional protections "merely by approaching individuals . . . and putting questions to them if they are willing to listen," as Dameron and Norton did by conducting a knock and talk with Routon and Norton at their hotel room door on January 19, 2018. United States v. Drayton, 536 U.S. 194, 200 (2002); Fla. v. Jardines, 569 U.S. 1, 8 (2013) (holding that "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do"). The defendants asked Routon and Norton to come outside the room to talk, and the record

establishes that Routon and Norton voluntarily complied with that request.[8] Therefore, the court will grant the defendants' motion for summary judgment as to claim (1), regarding the knock and talk.

2. Heck v. Humphrey.

It is well established that "a prisoner cannot use § 1983 to obtain damages where success would necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence." Wilkinson v. Dotson, 544 U.S. 74, 81 (2005) (interpreting the holding in Heck v. Humphrey, 512 U.S. 477 (1994)) (emphasis added). Norton and Dameron argue that most of Routon's claims of unlawful search or seizure are barred under Heck, and the court agrees.

In Heck, the Supreme Court held that in order for a § 1983 plaintiff to recover damages for an unconstitutional conviction or "other harm caused by actions whose unlawfulness would render a conviction . . . invalid," the plaintiff must prove that the conviction

> has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction . . . that has not been so invalidated is not cognizable under § 1983.

544 U.S. at 486–87. Before a district court can dismiss a § 1983 action or claim based on its relationship to a conviction, the court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. at 487.

[8] Routon alleges that Dameron tricked him into talking outside by mentioning Routon's son, which Dameron denies. Whatever the topic Dameron used, however, it is undisputed that Routon left the room voluntarily to speak with the deputy. Such circumstances simply do not constitute an unconstitutional seizure.

As discussed, under a Fourth Amendment analysis, when an officer restrains an individual's freedom to walk away, "he has seized that person." Terry, 392 U.S. at 16. During such a Terry stop, an officer can conduct a "reasonable search for weapons" for his own protection, "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27. "[A] guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures," such that an officer must normally obtain the guest's consent or a warrant to conduct a lawful search of that room.[9] Stoner v. State of Cal., 376 U.S. 483, 490 (1964). Absent consent, "a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Detaining an individual without probable cause and refusing him entry to his residence or hotel room for a lengthy period while officers obtain a search warrant violates Fourth Amendment principles if it serves no "legitimate public interest." United States v. Watson, 703 F.3d 684, 694 (4th Cir. 2013). And where a law enforcement officer includes in the search warrant affidavit a false statement, whether knowingly and intentionally or with reckless disregard for the truth, and the allegedly false statement is necessary to the finding of probable cause, the defendant states a viable Fourth Amendment challenge to the lawfulness of the underlying search itself. Franks v. Delaware, 438 U.S. 154, 171-72 (1978).

Routon's § 1983 action challenges directly the legality of the defendants' evidence gathering at the hotel. Routon asserts that his detention on the hotel balcony while Norton procured

[9] A guest of a guest in a hotel room may share that expectation of privacy under certain circumstances. See, e.g., United States v. Grandstaff, 813 F.2d 1353, 1357 (9th Cir. 1987) (sharing hotel room, staying overnight, or storing luggage might be sufficient to connote expectation of privacy).

the search warrant, the search of his pockets incident to that detention,[10] his arrest after the incident in the hotel room, Dameron's reentry of the room with Nichols and an ensuing, warrantless search, and Norton's search warrant proceedings were all without probable cause and, therefore, unreasonable and unconstitutional. He demands that the defendants should pay him monetary damages for these Fourth Amendment violations. But Routon fails to acknowledge what the record establishes—that this sequence of actions by the defendants led directly to Routon's indictments in Virginia circuit court and to his eventual guilty plea to one of those indictments after amendment. As such, pursuant to the doctrine in Heck, these Fourth Amendment claims fall squarely within the category of § 1983 claims that cannot exist while Routon's conviction stands.

While the Fourth Amendment does not "expressly preclude the use of evidence obtained in violation of its commands," court decisions have "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." Herring v. United States, 555 U.S. 135, 139 (2009). "Generally, evidence derived from an illegal search or arrest is deemed fruit of the poisonous tree and is inadmissible." United States v. Najjar, 300 F.3d 466, 477 (4th Cir. 2002). Accordingly, "[w]hen evidence derived from an illegal search [or arrest] would have to be suppressed in a criminal case if the judgment in the § 1983 claim were to be applied to the criminal case and the suppression would necessarily invalidate the criminal conviction, the stated principle of Heck would apply, and the § 1983 claim would have to be dismissed." Ballenger v. Owens, 352 F.3d 842, 846 (4th Cir. 2003).

The Supreme Court recognized a narrow exception to this Heck-based rule. In some circumstances, a § 1983 action based on an allegedly unreasonable search

[10] The defendants do not argue that Routon's claim about Dameron's search of his pants pockets is barred by Heck. The court finds otherwise, because this search was incident to Dameron's efforts to detain Routon physically from reentering his hotel room while waiting for Norton to procure the search warrant. See Am. Compl. ¶¶ 145-47, ECF No. 47-1.

> may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful.

Heck, 512 U.S. at 487 n. 7. Routon presents no evidence showing that his case qualifies for such an exception, however. Nothing in the record suggests that absent the evidence seized or otherwise obtained in conjunction with the hotel room search and the resultant interviews of Routon and Norton on January 19, 2018, the authorities could, nevertheless, have charged and convicted Routon of the offense for which he is currently confined.

On the contrary, Routon's conviction occurred as a direct result of the events he challenges in this case. The indictments against him and the factual basis for the guilty plea he ultimately entered rested on the evidence that authorities procured from the hotel room incidents and the concurrent interviews with the defendants. If Routon could prove, as he alleges in the § 1983 action, that the search and his arrest on January 19, 2018, were unlawful under Fourth Amendment precepts, the evidence in support of the indictments and the guilty plea would have to be suppressed in a criminal case as fruit of the poisonous tree. And suppression of that evidence would necessarily invalidate Routon's criminal conviction. Thus, the rule in Heck applies, and Routon's remaining Fourth Amendment search and seizure claims must be dismissed. Ballenger, 352 F.3d at 846. Therefore, the court will grant the defendants' motion for summary judgment as to claims (2), (3), (6), (7), and (8).

The defendants assert that claim (4), alleging that Dameron and Norton used excessive force against him in his hotel room, is also barred under Heck. As discussed, the search warrant affidavit included a description of Routon reentering the hotel room, striking Dameron with the door, and resisting placement in handcuffs. The defendants contend that Magistrate Blair's finding

of probable cause to issue the search warrant, based in part on these facts, pulls Routon's excessive force claims into the Heck category of claims that are barred until his conviction is overturned. This argument stretches Heck too far. The court has already found that Routon's claim of no probable cause to detain him or to arrest him when he reentered his room in contravention of Dameron's orders raises an exclusionary rule question that could invalidate his conviction and is, therefore, barred under Heck.[11] Whether or not Dameron and Norton used more force than warranted while detaining him, however, is a separate and viable § 1983 claim that does not implicate Heck concerns. See Riddick v. Lott, 202 F. App'x 615, 617 (4th Cir. 2006) ("Heck does not bar § 1983 actions alleging excessive force despite a plaintiff's [charge] for resisting arrest because a state court's finding that [a plaintiff] resisted a lawful arrest . . . may coexist with a finding that the police officers used excessive force to subdue [the plaintiff].").

C. The Excessive Force Claim.

Claims of excessive force during a search or seizure are analyzed under the Fourth Amendment, which applies an objective "reasonableness" standard to assess the use of force. Graham v. Connor, 490 U.S. 386, 394-95 (1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

---

[11] The Heck decision itself is instructive:

> An example of . . . a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest. . . . He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. . . . [T]he § 1983 action will not lie.

512 U.S. at 487. Routon, in addition to claiming unreasonable seizure (i.e. seizure without probable cause), also alleges that Dameron and Norton used more force than circumstances warranted (i.e. used excessive force to accomplish the seizure, whether or not that seizure itself was lawful). Success on this claim does not require Routon to negate any element of the offense for which he stands convicted—possession of meth.

Id. at 396. Three factors must guide the objective reasonableness inquiry: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect is resisting arrest or attempting to flee. Id. at 396. A court must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397.

Police officers are not required to perfectly interpret the situation, or to react perfectly to it. See, e.g., Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001) (finding officers entitled to qualified immunity after shooting unarmed suspect, because officers reasonably believed that suspect might have been reaching for a weapon). Rather, officers are entitled to qualified immunity against suits for damages if a reasonable officer facing the same situation would not have known that his actions violated the plaintiff's clearly established constitutional right. Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Where there exists no genuine dispute of material fact, the objective reasonableness of a particular use of force is an issue of law for the court. See, e.g., Scott v. Harris, 550 U.S. 372, 378-79 & n. 5 (2007) (holding that video recording of plaintiff's encounter with police "sp[oke] for itself" and established the absence of any genuine dispute of material fact bearing on objective reasonableness). When resolution of the qualified immunity question and the Fourth Amendment claim itself both depend upon a determination of what actually happened, however, summary judgment is not proper. Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995). Accordingly, the district court should not grant summary judgment where "there remains any material factual dispute regarding the actual conduct of the defendants." Id.

Taking the evidence in the light most favorable to Routon as the nonmovant, the court finds that genuine issues of material fact remain in dispute regarding his allegations of excessive force. The defendants state that after Dameron directed Routon not to return to his hotel room, Routon darted into the room, the door shut on Dameron as he followed, Routon resisted Dameron's attempts to prevent him from entering further into the room, and resisted Dameron and Norton's efforts to handcuff him behind his back. They contend that because of his actions, their use of force—including punches and knee drops to convince him to surrender his hands for cuffing—was reasonable under the circumstances. By contrast, Routon states in his verified pleadings that he walked back into his hotel room, the door shut on Dameron by accident, Dameron tackled Routon without explanation, and Routon did not resist, but the defendants punched and kneed him while holding his arms and yelling at him to allow himself to be handcuffed. Routon also states that after he was in handcuffs, Dameron choked him and then jerked him to his feet using his cuffed arms, all of which Dameron denies.[12] On this evidence, Routon argues that the defendants acted unreasonably in using such force against an unresisting, non-threatening individual who was not suspected or arrested on a serious crime. Graham, 490 U.S. at 396. These disputes between the parties' accounts are material and preclude summary judgment.

The defendants also offer evidence that Routon had no visible injuries when he walked to the patrol car or when he was booked into two different jails in three days. Routon states in his verified pleadings that he suffered extreme pain at the time and has suffered ongoing pain and mental health issues as a result of the struggle with the defendants on January 19, 2018. Again, these disputes that the parties' evidence present are material and preclude summary judgment.

[12] Routon has submitted a declaration by Nichols that, in large part, corroborates his account of events inside the hotel room that day and contradicts the defendants' version. See Nichols Decl., ECF No. 250-1. Even without this declaration, however, Routon's own verified pleadings are sufficient to withstand the defendants' evidence on summary judgment.

The defendants argue that Routon's conversations with the defendants in the patrol car after his arrest make his claims of excessive force and physical injury so unbelievable, by comparison, that no reasonable juror could find in his favor on the excessive force claims. This argument cannot stand in the face of the court's clear responsibility on summary judgment not to weigh the credibility of the parties' evidence. Williams, 372 F.3d at 667. It will be for a jury to determine the credibility of the parties' testimony and evidence. For the stated reasons, the court concludes that as to Routon's claim (4), alleging that Dameron and Norton used excessive force against him when detaining and restraining him in the hotel room, the defendants' motion for summary judgment must be denied.[13]

The court will grant their motion, however, as to any claim that Norton failed to intervene when Dameron was allegedly choking Routon during that encounter.

> The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them. . . . Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, [s]he may be deemed an accomplice and [be] treated accordingly.

Randall v. Prince George's County, MD., 302 F.3d 188, 203 (4th Cir. 2002) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (observing that officer who stands by and does not seek to assist victim could be "tacit collaborator"). Routon's allegations do not indicate that the choking incident lasted more than a few seconds or that Norton had the opportunity or ability to physically intervene within that time.[14]

---

[13] The same factual disputes that preclude summary judgment on the Fourth Amendment claims also render meritless the defendants' assertion that they are entitled to summary judgment on the ground of qualified immunity on the excessive force claims. Buonocore, 65 F.3d at 359.

[14] To the extent that Routon's second amended complaint reasserted conspiracy claims, those claims are not properly before the court. In the prior memorandum opinion and order granting the defendants' motion to dismiss in part, the court found that the conspiracy allegations failed to state an actionable claim under § 1983. Moreover, when Routon later sought leave to file the second amended complaint, the court denied that motion and stated that his proposed pleading would be considered only as his response to the defendants' summary judgment motion.

D. The State Law Claims.

Routon clearly asserts claims of assault and battery against Dameron and Norton, and the relationship between these claims and his allegations of excessive force is self-evident. Thus, the court has indicated its intent to exercise supplemental jurisdiction over these claims.

The defendants argue that viewing the evidence from their perspective, and in light of Routon's friendly conversations with the officers in the patrol car, they are entitled to summary judgment on the state law claims. They assert that,

> [b]ecause there is no significantly probative evidence that the deputies' force was excessive, and because the deputies' hand and knee strikes were reasonable, the deputies should be granted summary judgment on the Fourth Amendment excessive force claims. For the same reasons, the deputies are entitled to summary judgment on the state law assault and battery claims. See Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) ("A legal justification for the act being complained of will defeat an assault or battery claim. Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties.").

Mem. Supp. Mot. Summ. J. 25, ECF No. 235. Indeed, the defendants may be able to persuade a fact finder to rule in their favor on the state law claims at trial. The court, however, cannot determine on summary judgment that their version of events is more worthy of belief than Routon's account of his actions and theirs. The court must deny summary judgment as to claim (5), alleging assault and battery claims against Dameron and Norton.

III. CONCLUSION.

For the foregoing reasons, the court concludes that the defendants' motion for summary judgment must be granted in part and denied in part. The motion must be denied as to claims (4) and (5), alleging § 1983 claims of excessive force and related state law claims of assault and battery. The motion must be granted as to Routon's other claims, alleging illegal search and seizure. An appropriate order will enter this day.

The clerk will send copies of this memorandum opinion and the accompanying order to the plaintiff and to counsel of record for the defendants.

**ENTER**: This 26th day of May, 2020.

Senior United States District Judge